BRIAN M. BOYNTON
    Principal Deputy Assistant Attorney General
MARCIA BERMAN
    Assistant Branch Director
MICHAEL J. GERARDI
    Senior Trial Counsel
    Civil Division, Federal Programs Branch
    U.S. Department of Justice
    1100 L St., N.W.
    Washington, D.C. 20005
    Telephone: (202) 616-0680
    E-mail: michael.j.gerardi@usdoj.gov

*Counsel for Defendant*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOIACONSCIOUSNESS.COM LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>NATIONAL ARCHIVES & RECORDS ADMINISTRATION,<br><br>　　　　　　　Defendant. | CASE NO. 3:24-cv-00997-JD<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF SUPPORTING POINTS AND AUTHORITIES**<br><br>Date:　　　　December 5, 2024<br>Time:　　　　10:00 AM<br>Courtroom 11, 19th Floor |

**TABLE OF CONTENTS**

NOTICE OF MOTION ........................................................................................................... v

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

I.      NARA Policy Regarding Copyrighted Materials .................................................. 3

II.     The Zapruder Film ................................................................................................ 4

        A.      Creation And Initial Disposition Of The Zapruder Film ......................... 4

        B.      NARA Takes Custodial Possession Only Of The Zapruder Film .......... 5

        C.      Congress Enacts The JFK Act ............................................................... 5

        D.      The Government Seizes The Zapruder Film, But Not The Copyright ..... 6

        E.      The "Weitzman Film" .............................................................................. 7

        F.      Current Public Access To The Zapruder Film ........................................ 8

III.    Plaintiff's FOIA Request And This Litigation ....................................................... 9

STANDARD OF REVIEW ................................................................................................. 10

ARGUMENT .................................................................................................................... 11

I.      NARA's Response Satisfied FOIA, And The Requested Records Are Not
        "Readily Reproducible" As NARA-Made Copies ............................................... 12

II.     Alternatively, Unauthorized NARA-Made Copies Of The Requested Films Are
        Exempt From Disclosure Under FOIA's Exemption 4 ........................................ 14

CONCLUSION ................................................................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Assassination Archives & Rsch. Ctr. v. U.S. Dep't of Just.,*
   43 F.3d 1542 (D.C. Cir. 1995) ............................................................................. 6

*Chamberlain v. U.S. Dep't of Just.,*
   957 F. Supp. 292 (D.D.C. 1997) .......................................................................... 13

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.,*
   58 F.4th 1255 (D.C. Cir. 2023) ............................................................................ 15

*Food Marketing Institute v. Argus Leader Media,*
   588 U.S. 427 (2019) ....................................................................................... 11, 15

*Gilmore v. U.S. Dep't of Energy,*
   4 F. Supp. 2d 912 (N.D. Cal. 1998) ......................................................... 10, 15, 16

*Hamdan v. U.S. Dep't of Just.,*
   797 F.3d 759 (9th Cir. 2015) ............................................................................... 11

*Lane v. Dep't of Interior,*
   523 F.3d 1128 (9th Cir. 2008) ............................................................................. 11

*LaRoche v. SEC,*
   289 F. App'x 231 (9th Cir. 2008) ........................................................................ 13

*Larson v. Dep't of State,*
   565 F.3d 857 (D.C. Cir. 2009) ............................................................................. 11

*Minier v. CIA,*
   88 F.3d 796 (9th Cir. 1996) ................................................................................... 6

*Miscavige v. IRS,*
   2 F.3d 366 (11th Cir. 1993) ................................................................................. 11

*Naumes v. Dep't of the Army,*
   588 F. Supp. 3d 23 (D.D.C. 2022) ................................................................. 15, 16

*Nat'l Immigration Law Ctr. v. ICE ,*
   No. 14-cv-9632-PSG, 2015 WL 12684437 (C.D. Cal. Dec. 11, 2015) ................... 11

*Scudder v. CIA,*
   25 F. Supp. 3d 19 (D.D.C. 2014) ......................................................................... 12

*Tax Analysts v. U.S. Dep't of Just.,*
   845 F.2d 1060 (D.C. Cir. 1988) ........................................................................... 13

*Time Inc. v. Bernard Geis Assocs.*,
    293 F. Supp. 130 (S.DN.Y. 1968).................................................................... 4, 5

*TPS, Inc. v. U.S. Dep't of Def.*,
    330 F.3d 1191 (9th Cir. 2000) ........................................................................ 12

*Watkins v. U.S. Bureau of Customs & Border Prot.*,
    643 F.3d 1189 (9th Cir. 2011) ........................................................................ 14

*Weisberg v. U.S. Dep't of Just.*,
    631 F.2d 824 (D.C. Cir. 1980) ........................................................................ 12

*Zemansky v. EPA*,
    767 F.2d 569 (9th Cir. 1985) .......................................................................... 11

**Statutes**

5 U.S.C. § 552(a)(3) ............................................................................................... *passim*

5 U.S.C. §  552(b) .................................................................................................. 11

17 U.S.C. § 106 ........................................................................................................ 7

17 U.S.C. § 107 ........................................................................................................ 3

17 U.S.C. § 108(f) .................................................................................................... 3

17 U.S.C. § 504(b) .................................................................................................. 15

28 U.S.C. § 1498(b) ............................................................................................. 4, 13

44 U.S.C. § 2107 ...................................................................................................... 3

President John F. Kennedy Assassination Records Collection Act of 1992,
    Pub. L. No. 102-526, 106 Stat. 3443 .......................................................... *passim*

**Regulations**

36 C.F.R. § 1254.62 ............................................................................................... 1, 3

**Other Authorities**

Assassination Records Review Board, *Final Report of the Assassination Records Review Board*
    (1998), *available at* https://perma.cc/C9QE-6VPT ......................................... 6

Assassination Records Review Board, *Formal Determinations, Releases, Assassination Records
    Designation, and Reconsideration*, 62 Fed. Reg. 27,008 (May 16,1997) ............ 6

National Archives, *Independent Researchers For Hire–Media Types*, https://perma.cc/3957-
    7LMR (last accessed Sept. 5, 2024) .................................................................... 8

*FOIAConsciousness.com v. NARA*, Case No. 3:24-cv-00997-JD
Defendant's Motion for Summary Judgment
iii

National Archives, *Order Copies of Moving Image and Sound Holdings*,
https://perma.cc/8NWK-FLAM (last accessed Sept. 5, 2024) ..................................... 8

National Archives, *Permissions / Rights for Use of Special Media Records at NARA*,
https://perma.cc/FVA9-VVGW (last accessed Sept. 5, 2024) ..................................... 3

National Archives, *Source and Permission Contact List*, https://perma.cc/7XDX-M8Z2
(last accessed Sept. 5, 2024) ..................................... 3

National Archives, *What's an Archives?*, https://perma.cc/4GGX-9NLW (last accessed
Sept. 5, 2024) ..................................... 3

The Sixth Floor Museum at Dealey Plaza, *Abraham Zapruder Film*, https://perma.cc/8NX6-
FZ3W (last accessed Sept. 5, 2024) ..................................... 4

The Sixth Floor Museum at Dealey Plaza, *Media Inquiries*, https://perma.cc/B4US-3HZC
(last accessed Sept. 5, 2024) ..................................... 9

The Sixth Floor Museum at Dealey Plaza, *Rights and Reproduction Request Form*,
https://perma.cc/HQ8U-BKNC (last accessed Sept. 5, 2024). ..................................... 9

1

## **NOTICE OF MOTION**

2    PLEASE TAKE NOTICE that Defendant National Archives and Records Administration

3  ("NARA") hereby requests summary judgment in its favor on all claims in the complaint filed by

4  Plaintiff FOIAconsciousness.com LLC ("Plaintiff"), pursuant to Federal Rule of Civil Procedure

5  56. Defendant's motion is based on this notice and the accompanying Memorandum of Points

6  and Authorities, the Declaration of Daniel Rooney, and the exhibits attached thereto.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The National Archives and Records Administration ("NARA") collects, preserves, and maintains documents that record important events in American history. Some of these materials, particularly audio and film works, are protected by copyrights held by private entities. In terms of responding to requests to reproduce such materials, NARA operates no differently than any other library or archives: it will help members of the public fulfill such requests, provided they "obtain[ ] any necessary permission for use, copying, and publication from copyright holders and for any other applicable provisions of the Copyright Act." 36 C.F.R. § 1254.62.

Plaintiff FOIAConsciousness.com LLC seeks to make an end-run around NARA's policy regarding copyrighted materials in its collections. Plaintiff submitted a Freedom of Information Act ("FOIA") request to NARA for two versions of the "Zapruder Film." The Zapruder Film depicts the assassination of President Kennedy on November 22, 1963. It was shot at Dealey Plaza in Dallas, Texas by Abraham Zapruder using his 8 mm home movie camera. The Zapruder Film, including all derivatives and copies thereof, is subject to a copyright originally held by Mr. Zapruder, and subsequently by his family after his passing in 1970. Mr. Zapruder and his family consistently and vigorously enforced their copyright in the Zapruder Film for decades. The copyright is owned today by the Sixth Floor Museum ("Museum") in Dallas, Texas, which received it from the Zapruder family via a donation and continues to enforce the copyright.

NARA makes numerous versions of the Zapruder Film available to the public (it is also widely available for viewing, for free, on the Internet), and it responded to Plaintiff's FOIA request by informing it (1) that the requested films could be viewed, and a copy of it could be made by Plaintiff, at NARA's facility in College Park, Maryland; and (2) that NARA could facilitate reproduction of the film through its reproduction ordering process, with an outside vendor, upon Plaintiff's obtaining consent from the Museum. In practice, the Museum frequently grants such requests. Instead of pursuing either of these paths, Plaintiff filed this lawsuit, challenging the requirement that it obtain permission from the Museum for NARA to place a reproduction order for requested copies under FOIA. NARA is entitled to summary judgment on

Plaintiff's FOIA claim, for two independent reasons.

*First*, NARA's response to Plaintiff's FOIA request met the statute's requirements. FOIA only requires agencies to make copies of requested records in a particular form or format "if the record is readily reproducible by the agency in that form or format." 5 U.S.C. § 552(a)(3). As explained, NARA already provides facilities for members of the public to make self-serve copies of films provided in NARA's research room. But NARA does not make copies of these films, or supervise the copying of these films; patrons assume the risk of copyright liability for any copies they make while visiting a NARA facility. NARA will facilitate reproduction requests from members of the public, but it has not handled such requests in-house for decades because it lacks the staffing to do so in a timely way for the thousands of such requests it receives annually. NARA instead relies on private vendors to assist with such reproductions. Both NARA and its vendors could be potentially liable for copyright infringement if NARA were to cooperate with its vendor to reproduce materials subject to a known, in-force copyright without permission from the rightsholder. Absent such permission, neither version of the Zapruder Film requested here is "readily reproducible" in the form of a reproduction made or facilitated by NARA.

*Second*, contrary to Plaintiff's broad claim that "copyright is not a FOIA exemption," copyrighted materials can be the sort of confidential commercial information obtained from a person that is exempt from disclosure under FOIA's Exemption 4 in certain situations. Here, Exemption 4 permits NARA to refrain from responding to Plaintiff's FOIA request with NARA-made copies of the requested versions of the Zapruder Film. The requested versions of the Zapruder Film are commercial because, as copyrighted materials, they are intrinsically valuable and connected to profit. The films clearly originated from an outside source. And the ability of the copyright holder—including the Zapruder family and its successor in interest, the Museum—to legally control the use of the work is sufficient to deem the work confidential. Allowing FOIA to serve as a tool for circumventing copyright law would diminish the value of copyrighted works in an agency's possession (since anyone could obtain a reproduction at the cost of reproducing the physical media) and significantly limit the ability of NARA to work with copyright holders in preserving the nation's historically important records.

1    Accordingly, the Court should grant NARA summary judgment.

2                                                    **BACKGROUND**

3    **I.      NARA Policy Regarding Copyrighted Materials**

4            The National Archives is "the U.S. Government's collection of documents that records

5    important events in American history," and NARA "is the Government agency that preserves and

6    maintains these materials and makes them available for research." NARA, *What's an Archives?*,

7    https://perma.cc/4GGX-9NLW (last accessed Sept. 5, 2024). NARA's collections are replete with

8    copyrighted material. Although "[m]aterials created and produced by United States federal

9    agencies, or by an officer or employee of the United States Government as part of that person's

10   official duties," are not subject to copyright, "not all records in the holdings of the National

11   Archives . . . are in the public domain." National Archives, *Permissions / Rights for Use of Special

12   Media Records at NARA* ("*NARA Permissions*"), https://perma.cc/FVA9-VVGW (last accessed

13   Sept. 5, 2024). NARA, as well as federal agencies that transfer materials to NARA, possess

14   "records and donated historical materials [that] do have copyright protection." 36 C.F.R. §

15   1254.62. These sources range from widely used stock photo firms like Getty Images and National

16   Geographic, to the holders of the rights to newsreels produced by companies like Paramount and

17   Fox, to museums such as the Museum of Modern Art and the United States Holocaust Memorial

18   Museum. National Archives, *Source and Permission Contact List*, https://perma.cc/7XDX-M8Z2

19   (last accessed Sept. 5, 2024).  NARA instructs the public that they "are responsible for obtaining

20   any necessary permission for use, copying, and publication from copyright holders and for any

21   other applicable provisions of the Copyright Act." 36 C.F.R. § 1254.62.

22           In some situations, a member of the public may be able to make a copy of a record for

23   their personal use at a NARA facility, either by using equipment provided at the NARA facility

24   or by bringing their own equipment. With respect to copyrighted materials, NARA is not liable

25   for copyright infringement "for the unsupervised use of reproducing equipment located on its

26   premises" if proper notice is given to users, and users may be liable "for any such act, or for any

27   later use of such copy . . . if it exceeds fair use as provided by [17 U.S.C. § 107]." 17 U.S.C. §

28   108(f)(1)-(2); *see also* 44 U.S.C. § 2107 (NARA is "not liable for infringement of copyright or

analogous rights arising out of use of the materials for display, inspection, research, reproduction, or other purposes."). This carve-out to copyright infringement liability would not apply if NARA made, or supervised the making of, copies without the consent of the copyright holder.[1] As such, NARA "reserves the right to refuse to fill any reproduction request if, in NARA's judgment, fulfillment of the order might violate copyright law, or is not accompanied by permission from the copyright holder or collection donor." *NARA Permissions.*

NARA's respect for copyright law is critical to its mission. Congress has waived the federal government's sovereign immunity for copyright infringement claims, and NARA, as a federal agency, therefore faces legal risk if it handles materials in its possession in a manner that may infringe the copyright of a private entity. *See* 28 U.S.C. § 1498(b). NARA's ability to collect historically important materials would also be diminished if potential donors could not trust NARA to respect their intellectual property rights. Decl. of Dan Rooney ¶ 18 ("Rooney Decl.").

**II.   The Zapruder Film**

   **A.   Creation And Initial Disposition Of The Zapruder Film**

The Zapruder Film is an 8mm film strip that depicts the assassination of President John F. Kennedy on November 22, 1963. It was shot at Dealey Plaza in Dallas, Texas by Abraham Zapruder using his home movie camera. The Sixth Floor Museum at Dealey Plaza, *Abraham Zapruder Film* ("*SFM Catalog*"), https://perma.cc/8NX6-FZ3W (last accessed Sept. 5, 2024); *see also Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 133 (S.DN.Y. 1968). Mr. Zapruder had the film developed and made three color copies of the film on the day of the shooting. *Time Inc.*, 293 F. Supp. at 133. Shortly after the assassination, Mr. Zapruder turned over two copies of the film to the Secret Service, "specifying that it was strictly for government use and not to be shown to newspapers or magazines because he expected to sell the film." *Id.* Mr. Zapruder subsequently entered a license agreement with Time, Inc. for $150,000, to be paid in six installments of $25,000 each. Rooney Decl. Ex. D at 2 (Arbitration Decision). The Warren Commission "made extensive use of the Zapruder film, and placed great reliance upon it" in its report about the assassination

---

[1] Section 108 of the Copyright Act applies exclusively to "libraries and archives," and provides a number of exceptions under which an archives can make a copy of a copyrighted work in its possession that are not relevant to this dispute.

of President Kennedy. *Time Inc.*, 293 F. Supp. at 134. This use was made with the knowledge and consent of Time, Inc. *Id.*

### B.     NARA Takes Custodial Possession Only Of The Zapruder Film

Mr. Zapruder passed away in 1970. In 1975, Time, Inc. returned custody of the Zapruder Film to the surviving members of Mr. Zapruder's family in exchange for $1, per the terms of the license agreement.[2] Arbitration Decision at 2. Three years later, the family deposited the original "out-of-camera" version of the Zapruder Film with NARA. In a "custodial agreement" prepared by the family contemporaneously with making this deposit, the family stated that it was giving NARA only a limited possessory right to the film and that NARA "has acquired no rights whatsoever to the Film." Rooney Decl. ¶ 9 & Ex. A. The agreement provided instructions as to where the film would be stored and how access to it would be managed in conjunction with the Zapruder family. *Id.* Until the 1990s, NARA handled all access requests to the Zapruder Film (including both the original, out-of-camera Zapruder Film and any copies thereof) in accordance with the terms described in the deposit letter. *Id.* ¶ 10.

### C.     Congress Enacts The JFK Act

In 1992, President George H.W. Bush signed into law the President John F. Kennedy Assassination Records Collection Act of 1992, 106 Pub. L. No. 102-526, 106 Stat. 3443 ("JFK Act"). The purpose of the JFK Act was, among other things, to "provide for the creation of the President John F. Kennedy Assassination Records Collection at [NARA]" and "require the expeditious public transmission to the Archivist and public disclosure of such records." JFK Act § 2(b)(1)-(2). Section 7 of the JFK Act created an Assassination Records Review Board ("ARRB") to administer the statute. Upon the completion of its work, the ARRB's records were transferred to the National Archives. *Id.* § 7(o)(3). Under the JFK Act, "[a]ll assassination records transmitted to the National Archives for disclosure to the public shall be included in the Collection and shall be available to the public for inspection and copying at the National Archives within 30 days after their transmission to the National Archives." *Id*. § 4(b).

The JFK Act does not "alter the procedure for reviewing FOIA requests," and does not

---

[2] The family members created a corporate entity, LMH Company, to manage the asset.

"override [an agency's] ability to claim proper FOIA exemptions. *Minier v. CIA*, 88 F.3d 796, 802 (9th Cir. 1996). "Congress's intent" in enacting the JFK Act was "that the standards of the [JFK] Act should be applied through the Act's own process, a process that includes review by the federal courts (where available at all) only for 'final actions taken or required to be taken under [the JFK Act],'" under the Administrative Procedure Act. *Assassination Archives & Rsch. Ctr. v. Dep't of Just.* ("*AARC*"), 43 F.3d 1542, 1544 (D.C. Cir. 1995). Following Congress's intentions, the Ninth Circuit has "rejected the notion that the concerns of the JFK Act should be engrafted onto FOIA requests," and "concluded that the drafters of the JFK Act intended 'to leave FOIA's completely separate character unaffected.'" *Id.* (quoting *AARC*, 43 F.3d at 1544).

### D.    The Government Seizes The Zapruder Film, But Not The Copyright

In 1997, the ARRB designated "the out-of-camera original Zapruder Film currently housed at the National Archives" as an "assassination record." ARRB, *Formal Determinations, Releases, Assassination Records Designation, and Reconsideration*, 62 Fed. Reg. 27,008 (May 16, 1997); *see also* ARRB, *Minutes of Open Board Meeting of Apr. 24, 1997* ("*Meeting Minutes*"), Rooney Decl. ¶¶ 11-12 & Ex. B. The Board directed the film to be transferred to the Collection on August 1, 1998. *Id.*; *see also* ARRB, *Final Report of the Assassination Records Review Board* ("*Final Report*") 124-25 (1998), *available at* https://perma.cc/C9QE-6VPT. NARA complied with (and continues to comply with) the public access provision of the JFK Act with respect to the film, as detailed below.

In order to determine "just compensation" for the Government's "August 1, 1998 taking of the private property of [the Zapruder Family] pursuant to the [JFK Act]," the federal government entered into an arbitration agreement with the Zapruder family. Arbitration Agreement at 1, Rooney Decl. ¶¶ 13-14 & Ex. C. The agreement reiterated that the Zapruder family "retained ownership of the Copyright" in the film; that "[t]he Government's right to use the Film is governed by the copyright laws of the United States . . . and the [JFK Act]"; and that "[n]othing in this Arbitration Agreement alters LMH's right to fully enforce its Copyright." *Id.* The arbitration panel reached its decision on August 9, 1999, awarding the Zapruder family $16 million in compensation for the out-of-camera original version of the Zapruder Film. Arbitration

Decision at 13. The arbitration panel reaffirmed the nature of the interest the federal government had acquired:

> The United States is required only to pay just compensation for the original of the film; [the Zapruder family] retains commercial control of the images. Any purchaser of the film could not publicly project the film or exhibit copies of its frames without infringing upon the [Zapruder family] copyright. When the Government seizes property pursuant to the Fifth Amendment, it must pay only for the property actually taken, not for collateral interests.

*Id.* at 3 (internal citation omitted); *see also id.*, Separate Statement of Walter Dellinger, at 1-2 (Zapruder family "continues to own all copyrights in the Zapruder film" and "retains full commercial control of its visual images"). After the arbitration, the Zapruder family donated their copyright in the Zapruder Film to the Sixth Floor Museum at Dealey Plaza in Dallas, Texas, and the Museum remains the copyright holder to this day. Decl. of Nicola Longford ("Longford Decl.") ¶ 4, ECF No. 26-1.

> ### E.        The "Weitzman Film"

The copyright of the Sixth Floor Museum extends not only to the original out-of-camera Zapruder Film, but to all reproductions of the film, as well as derivative works prepared from the film. 17 U.S.C. § 106 (copyright holder has "exclusive right" to "reproduce the copyrighted work" and "prepare derivative works"); *see also id.* § 103(b) ("The copyright in a . . . derivative work extends only to the material contributed by the author of such work . . . ."). NARA is in possession of versions of the Zapruder Film that were transferred to NARA by federal agencies, donated by private citizens or other non-federal institutions, or made by the Archives itself for preservation, reproduction, and access purposes. Rooney Decl. ¶ 19.

This collection includes multiple versions of the so-called "Weitzman Film."  The Weitzman Film is a version of the Zapruder Film created by Moses Weitzman, a special effects film expert who enlarged the original Zapruder Film from 8mm format to 16mm and 35mm formats in the late 1960s for Time, Inc. *Final Report* at 138-39; *see also* Rooney Decl. ¶ 22. Mr. Weitzman donated a 16mm copy of the Zapruder Film to the JFK Collection during the operation of the ARRB. Final Report at 138. In addition to this original film reel, the Collection contains two VHS copies of the Weitzman Film that were studied by the ARRB during its research into

the Zapruder Film. Rooney Decl. ¶ 24. The first, found at NARA catalog number 541-LIBRARY-54, is a direct transfer of the 16mm film reel Weitzman donated to NARA to VHS. *Id.* The second, 541-LIBRARY-53, is a version of the same film with "manipulations" done to slow down and stop the film at various points performed by Charles Mayn, a NARA employee. *Id.* (For ease of reference, this brief will refer to this version of the Weitzman Film as the "Mayn Film.")

**F.      Current Public Access To The Zapruder Film**

Plaintiff alleges that public access to the Zapruder Film was closely circumscribed for many years. *See* Compl. ¶¶ 39-48. Today, the film is widely available for viewing, for free, on the Internet, including on the website of the Museum. *See SFM Catalog.* As for NARA, all versions of the Zapruder Film that are part of the Collection, including the Weitzman Film and the Mayn Film, are available to the public for viewing at its facility in College Park, Maryland. Rooney Decl. ¶¶ 16, 21, 25. Visitors to the College Park facility may purchase a blank DVD from NARA and use equipment provided by NARA to make a copy of the DVD or VHS "reference copy" of the film that NARA provides to visitors to the research room. *Id.* Visitors may also bring their own equipment to make these copies. *Id.* In addition, NARA provides a list of researchers who will make such copies for members of the public who are unable to visit NARA's facility in College Park. *Id.*; *see also* National Archives, *Independent Researchers For Hire – Media Types*, https://perma.cc/3957-7LMR (last accessed Sept. 5, 2024). This access is compliant with the JFK Act, which requires NARA to make the materials in the Collection "available to the public for inspection and copying at the National Archives." JFK Act § 4(b).

NARA also has a process for members of the public to order copies of its motion picture holdings, which NARA fulfills with the assistance of third-party vendors. National Archives, *Order Copies of Moving Image and Sound Holdings*, https://perma.cc/8NWK-FLAM (last accessed Sept. 5, 2024). NARA's Moving Image and Sound Branch responds to thousands of reference inquiries from the public and approves hundreds of vendor order requests each year; it could not timely respond to all such requests without the assistance of vendors. Rooney Decl. ¶ 17. As is the case for all records subject to a known, in-force copyright, NARA requires that those asking NARA to make a copy of the Zapruder Film obtain the permission of the Museum, in order

to limit NARA's copyright exposure, as discussed above. Rooney Decl. ¶¶ 17, 26. Due to the potential liability for copyright infringement for both NARA and its vendors if it were to reproduce a film subject to a known, in-force copyright, NARA does not consider records readily reproducible in this manner without the consent of the copyright holder. *Id.* ¶¶ 18, 35.

This policy is consistent with the views of the Museum, which asks the public to obtain its permission before reproducing the Zapruder Film. Sixth Floor Museum, *Media Inquiries*, https://perma.cc/B4US-3HZC (last accessed Sept. 5, 2024) ("The Museum holds the copyright to the Zapruder film . . . which [is] available for licensing for specific purposes. Please complete the Rights and Reproductions Request Form to request permission to reproduce and/or license any historic films, footage, or images from the Museum's collections."). The Museum asks requestors to provide their contact information, the type of use they seek to make of the requested media (commercial, nonprofit, research, etc.), and the purpose of their use. Sixth Floor Museum, *Rights and Reproduction Request Form*, https://perma.cc/HQ8U-BKNC (last accessed Sept. 5, 2024). The Museum frequently grants permission to make copies, when asked: "it has received and granted authorization to NARA for 27 FOIA requests for release of the film or portions thereof" since 2003. Longford Decl. ¶ 7. The Museum "typically grants licensing requests free of charge to researchers or others with an academic interest, but may charge a licensing fee for commercial use of the film." *Id.* ¶ 8.

## III.   Plaintiff's FOIA Request And This Litigation

Plaintiff submitted the following FOIA request to NARA on December 11, 2023:

On behalf of FOIACONSCIOUSNESS.COM, I would like to request from the National Archives in College Park, Maryland, copies of the following video cassettes:

1.   Moses Weitzman's Version of the Abraham Zapruder Film NAID: 597131 Local  ID: 541-LIBRARY-[54][3]

2.   Moses Weitzman's Version of the Abraham Zapruder Film with Manipulations Done at the National Archives NAID: 596950 Local ID: 541-LIBRARY-53: Format: Video: VHS. According to the Media Occurrence Note, The "slo – mo"

---

[3] NARA explained to Plaintiff that "the catalog contains an incorrect local identifier for this item, and it should be numbered 541-LIBRARY-54." Rooney Decl., Ex. E, at 3.

and manipulations on this tape were performed by Charles Mayn at the National Archives on August 2, 1996.

Rooney Decl. ¶ 29 & Ex. E at 6.

In response, NARA notified Plaintiff that screening copies of both films were available for viewing at NARA's College Park facility, but that "permission to reproduce the Zapruder Film must be obtained from [the] Sixth Floor Museum before copies may be . . . purchased through our vendor order process." *Id.* at 3. NARA's initial response overlooked the fact that the requestor could, at his own risk, make his own copy of the "reference copy" of the film at NARA's facility in College Park, but NARA corrected that statement in a follow-up email sent in response to questions from Plaintiff's counsel dated December 26, 2023. *Id.* at 2 ("[R]esearchers have been able to make copies [of the films] in our research room, and you could do the same. I apologize for the confusion.").

To NARA's knowledge, neither Plaintiff nor his counsel has visited the College Park facility to view or make copies of the films he requested. Rooney Decl. ¶ 34. Nor has Plaintiff sought the Museum's permission to copy the films. Compl. ¶ 57. Instead, Plaintiff appealed the FOIA request, Rooney Decl. ¶¶ 33 & 35, Exs. F & G, then filed the instant lawsuit against NARA and the Museum, claiming that it violates FOIA to require Plaintiff to obtain permission from the Museum to obtain a copy of the films under FOIA. Compl. ¶¶ 56-57, 60. The complaint alleges one cause of action against NARA—"Violation of FOIA for Failure to Disclose Records." *Id.* After the Museum moved to dismiss for lack of personal jurisdiction and the Court heard argument on that motion, Plaintiff dismissed the Museum from the case. ECF No. 40.

## STANDARD OF REVIEW

FOIA confers upon federal district courts "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *See* 5 U.S.C. § 552(a)(4)(B). Federal jurisdiction over a FOIA case thus depends on a showing that an agency has (1) improperly (2) withheld (3) agency records. *Gilmore v. U.S. Dep't of Energy*, 4 F. Supp. 2d 912, 917 (N.D. Cal. 1998). FOIA obligates agencies to make their "agency records" "available" to requestors "in any form or format requested by the person if the record is readily reproducible by the agency in that form or format."

5 U.S.C. § 552(a)(3)(B). FOIA sets forth nine enumerated exemptions from disclosure. *See id.* § 552(b). This Court should not "narrowly construe[]" these exemptions and instead should give them "a fair reading" in light of the "important interests . . . served by its exemptions." *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 439 (2019).

"Generally, FOIA cases should be handled on motions for summary judgment," and a detailed declaration submitted by an agency employee knowledgeable about the processing of the request is a sufficient basis for entering summary judgment in favor of the agency. *Lane v. Dep't of Interior*, 523 F.3d 1128, 1134-36 (9th Cir. 2008) (quoting *Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993)). "To prevail on summary judgment in a FOIA action, the federal agency must establish . . . that it has described with reasonable specificity the nature of the responsive documents and its justification for any nondisclosure." *See Nat'l Immigration Law Ctr. v. ICE*, No. 14-cv-9632-PSG, 2015 WL 12684437, at *2 (C.D. Cal. Dec. 11, 2015) (citing *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Hamdan v. U.S. Dep't of Just.*, 797 F.3d 759, 774 (9th Cir. 2015) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). FOIA also directs courts to give "substantial weight to an affidavit of an agency concerning the agency's determination as to . . . reproducibility under paragraph (3)(B)." 5 U.S.C. § 552(a)(4)(B).

## **ARGUMENT**

The focus of Plaintiff's complaint is the claim that it violates FOIA to require Plaintiff to obtain permission from the Museum, which holds the copyright to the Zapruder Film, to obtain NARA-made copies of the Weitzman Film and the Mayn Film that Plaintiff requested under FOIA. Because it is undisputed that this requirement applies only to copies of the Weitzman Film and Mayn Film that NARA would make for Plaintiff, and not to any copies that Plaintiff could itself make of those Films at NARA's facility, Plaintiff's complaint is properly understood to be seeking a NARA-made copy of the Weitzman Film and the Mayn Film.

NARA is entitled to summary judgment on Plaintiff's claim that NARA's response to its FOIA request violated FOIA, for two reasons. First, NARA is providing access to both the

Weitzman Film and the Mayn Film in a manner that satisfies FOIA, and the records are not "readily reproducible" in the form Plaintiff seeks (ie, a NARA-made copy). Second, NARA's response was proper because Exemption 4 of FOIA provides a basis for NARA to withhold NARA-made copies of the film from Plaintiff, until rightsholder permission is given.

I.   **NARA's Response Satisfied FOIA, And The Requested Records Are Not "Readily Reproducible" As NARA-Made Copies**

FOIA requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any) and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). The statute instructs the agency to "provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format." *Id.* § 552(a)(3)(B). In FOIA litigation, an agency affidavit as to whether a record is "readily reproducible" in a particular form or format is entitled to "substantial weight." *Id.* § 552(a)(4)(B). Although this statutory directive "does not amount to a blanket exemption from judicial review of the agency's justification for declining to comply with a specific format request," it does require "substantial deference" to the agency's determination. *Scudder v. CIA*, 25 F. Supp. 3d 19, 39 (D.D.C. 2014).

The Ninth Circuit has held that FOIA, "on its face, requires that the agency satisfy a FOIA request when it has the capability to readily reproduce documents in the requested format." *TPS, Inc. v. U.S. Dep't of Def.*, 330 F.3d 1191, 1195 (9th Cir. 2000). But it has not addressed the interaction between this test and copyrighted materials in an agency's possession. In *Weisberg v. DOJ*, 631 F.2d 824 (D.C. Cir. 1980), which concerned copyrighted photos used by the FBI in its investigation of the assassination of the Rev. Martin Luther King, Jr., the D.C. Circuit left open the possibility that an agency could "fulfill its responsibility under FOIA simply by making copyrighted materials available for inspection, rather than providing copies on request." *Weisberg*, 631 F.2d at 828. Subsequent decisions have found, in other contexts where reproduction is either technically or practically difficult, that "an agency need not respond to a FOIA request for copies of documents when the agency itself has provided an alternative form of

access," and that under FOIA, an agency is "not required by statute to mail copies of [records] . . . nor even to provide a requester-convenient location for access." *Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1065, 1067 (D.C. Cir. 1988), *aff'd*, 492 U.S. 136 (1989). In *Tax Analysts*, the D.C. Circuit rejected the suggestion that an agency would have to take on the "large administrative burden" of "making and sending copies of all federal district court tax decisions to [a FOIA requestor] on a weekly basis," and that compliance with FOIA "could involve no more than a memorandum to tax attorneys telling them to make an extra copy of district court decisions as they receive them and route such copies to a central file to which the plaintiffs would have access." *Id.* at 1066.[4]

The declaration of Mr. Rooney demonstrates that NARA's current access regime complies with FOIA, and that the agency does not need to make unauthorized reproductions of films subject to a known, in-force copyright in order to do so. NARA, like the rest of the federal government, faces potential legal exposure if it reproduces copyrighted works. *See* 28 U.S.C. § 1498(b). Engaging in such copying would also diminish NARA's ability to work with donors who rely on the agency to respect intellectual property rights. Rooney Decl. ¶ 18. Moreover, because NARA does not have the staffing to timely respond to the thousands of film reproduction requests it processes annually, it relies upon outside vendors to assist with timely reproduction of films. *Id.* Those vendors would potentially be liable for copyright infringement if they were to duplicate the requested films without permission of the copyright holder. As such, NARA "reserves the right to refuse to fill any reproduction request if, in NARA's judgment, fulfillment of the order might violate copyright law, or is not accompanied by permission from the copyright holder or collection donor." *NARA Permissions*. For all these reasons, the requested records are not "readily reproducible" in the form of a NARA-made copy absent the permission from the rightsholder. Rooney Decl. ¶¶ 18, 35.

---

[4] *See also LaRoche v. SEC*, 289 F. App'x 231, 231 (9th Cir. 2008) (affirming summary judgment in favor of agency because records sought were not readily reproducible in searchable electronic format requested by plaintiff); *Chamberlain v. U.S. Dep't of Just.*, 957 F. Supp. 292, 296 (D.D.C. 1997) (agency not required to reproduce requested records, where there would be "substantial expense" in doing so as well as "the possibility that the [records] might be damaged if photocopied").

NARA's policy regarding copyrighted materials hardly means that such materials in its collection are inaccessible to the public. NARA, in accordance with the JFK Act, does make the requested versions of the Zapruder Film available for viewing and copying at its College Park facility. A requestor who believes he is engaged in fair use and is willing to assume the risk of copyright infringement may make a take-home copy of the "reference copy" of the film that NARA provides to visitors. If Plaintiff cannot travel to NARA's facility, NARA provides a list of professional researchers in the Washington, D.C. area who will visit NARA facilities and make such copies. Since all Plaintiff seeks to do is to "view" the films to "find out the difference" between the requested versions, as the complaint suggests, Compl. ¶ 63, the access NARA already provides would appear to satisfy that need.  Finally, if Plaintiff prefers having NARA make a copy of these films for him through its vendor-ordering process, NARA will assist with that request, provided the requestor has permission from the Museum to do so. As noted above, the Museum's declarant has stated that the Museum has granted dozens of such requests from researchers over the years. Longford Decl. ¶ 6.

NARA is not obligated to reproduce a copyrighted work to respond to a FOIA request if the requestor can give no assurance that it has the copyright holder's permission to reproduce the work in question. As such, NARA's response to Plaintiff's FOIA requests fulfills its statutory obligations under § 552(a).

## II.    Alternatively, Unauthorized NARA-Made Copies Of The Requested Films Are Exempt From Disclosure Under FOIA's Exemption 4

NARA does not need to claim an exemption from FOIA in this case because it has already made the requested films available to Plaintiff in compliance with FOIA. But even if the Court disagrees, NARA should still prevail because unauthorized NARA-made copies of these films are exempt from disclosure pursuant to FOIA's Exemption 4.

Exemption 4 excuses disclosure for "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The information must be (1) commercial or financial, (2) obtained from a person, and (3) confidential or privileged. Courts give the term "commercial" its ordinary meaning in this context. *Watkins v.*

1    *U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1198 (9th Cir. 2011). The same goes for

2    the term "confidential," which means the record is "'private' or 'secret.'" *Argus Leader Media*,

3    588 U.S. at 440. The requested films meet this test. *See* Rooney Decl. ¶¶ 18, 35.

4         First, the versions of the Zapruder Films at issue here, like all copyrighted works, are

5    "commercial" in nature. In enacting FOIA, Congress explained that Exemption 4 "is necessary to

6    protect the confidentiality of information which is obtained by the Government through

7    questionnaires or other inquiries, but which would customarily not be released to the public by

8    the person from whom it was obtained." S. Rep. No. 89-813, at 9 (1965). "[I]nformation is

9    commercial if it pertains . . . to the making of a profit." *Citizens for Resp. & Ethics in Wash. v.

10   U.S. Dep't of Just.* ("*CREW*"), 58 F.4th 1255, 1263 (D.C. Cir. 2023). Copyright permits authors

11   to see a fair financial return on their creations, thereby "promoting the Progress of Science and

12   useful Arts." U.S. Const. art. I, § 8, cl. 8. Indeed, a copyright infringer's "profits" are a potential

13   measure of damages in a copyright infringement case. 17 U.S.C. § 504(b). Thus, like the core

14   materials Congress sought to protect from disclosure using Exemption 4 ("business sales

15   statistics, inventories, customer lists, and manufacturing processes"), copyrighted materials are

16   "intrinsically valuable business information" that pertains to the making of a profit, and that

17   would not be released to the public by the copyright holder absent permission. *CREW*, 58 F. 4th

18   at 1263; *see also Naumes v. Dep't of the Army*, 588 F. Supp. 3d 23, 37 (D.D.C. 2022) ("[R]outine

19   release of copyrighted information through FOIA requests would undermine the market for the

20   creator's work in much the same way that the release of other types of commercial information

21   could inflict competitive harm."). This Court reached a similar conclusion in *Gilmore*: "If the

22   technology is freely available on the Internet, there is no reason for anyone to license [the

23   software] from [the developer], and the value of [the developer]'s copyright effectively will have

24   been reduced to zero." 4 F. Supp. 2d at 923.

25        Second, the materials in question indisputably originated from outside the government.

26   All copies of the Zapruder Film in NARA's possession ultimately had their origin in some source

27   from outside the government because the Zapruder Film was made by a private citizen. The

28   Weitzman Film (of which the Mayn Film is a derivative) is no exception. All versions of the film

are subject to the Museum's copyright because only the Museum has the exclusive right to reproduce the film and make derivative works from it.

Third, the requested materials are "confidential" in the sense required by Exemption 4. In *Naumes*, which applied the Supreme Court's *Argus Leader* decision, the district court held that, although "copyrighted sources provide a unique category of materials that are confidential until purchase and then accessible," they are nonetheless "confidential" for purposes of Exemption 4. *Naumes*, 588 F. Supp. 3d at 40. If the law were otherwise, the court reasoned, requestors could "use FOIA as an end run around the protections afforded by copyright to access information it would otherwise have to pay for," and "place agencies in the position of having to disclose information that could later lead to infringement suits." *Id.* The court in *Gilmore* reached a similar conclusion (albeit prior to the *Argus Leader* decision), reasoning that the "confidentiality" of the materials at issue there was underscored by the fact that "corporations will be less likely to enter into joint ventures with the government to develop technology if that technology can be distributed freely through the FOIA, irrespective of any intellectual property rights retained by the corporations." 4 F. Supp. 2d at 923.

The Court should likewise conclude here that Exemption 4 permits NARA to refrain from responding to Plaintiff's request with a NARA-made copy of the requested records. Throughout its ownership of the film, the Zapruder family (and its successor in interest, the Museum) have vigorously enforced their copyright of the Zapruder Film to prevent unauthorized use. This was true at the time of the assassination of President Kennedy, when Mr. Zapruder licensed the film to Time, Inc. and closely monitored government use of the film in the course of its investigations of the Kennedy assassination. It was true in the late 1970s, when the Zapruder family donated the out-of-camera original of the Zapruder Film to NARA but continued to closely scrutinize access to the film. It was true in the 1990s, when an arbitration panel emphatically reaffirmed the continuing validity of the Zapruder family's copyright after the out-of-camera original of the Zapruder Film was "seized" by the federal government. And it remains true today, as the Museum continues to assert that FOIA "requestor[s] must first obtain written permission from the Museum" to obtain a NARA-made copy of the Zapruder Film. Longford Decl. ¶ 6. Although any

member of the public who wishes to view the Zapruder Film can do so at the Museum's website or at NARA's facility, and visitors to NARA can make a take-home copy of the film in the research room, it remains the case that only the copyright holder (the Museum) can authorize NARA to reproduce the Zapruder Film. As such, Exemption 4 provides an adequate basis to withhold NARA-made copies of the requested films, absent permission from the Sixth Floor Museum.

## **CONCLUSION**

For these reasons, the Court should grant summary judgment in NARA's favor on Plaintiff's claim against NARA under FOIA.

Dated: September 5, 2024                   Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

                                           MARCIA BERMAN
                                           Assistant Branch Director

                                           */s/Michael J. Gerardi*
                                           MICHAEL J. GERARDI
                                            Senior Trial Counsel
                                           Civil Division, Federal Programs Branch
                                           U.S. Department of Justice
                                           1100 L St., N.W.
                                           Washington, D.C. 20005
                                           Telephone: (202) 616-0680
                                           E-mail: michael.j.gerardi@usdoj.gov

                                           *Counsel for Defendant*